IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JASON JAMES HYATT,

                              Plaintiff,                    OPINION AND ORDER

    v.

                                                16-cv-383-wmc

PORTAGE COUNTY SHERIFF MIKE LUKAS,
CAPTAIN CORY NELSON and
SERGEANT BOETTCHER,

                              Defendants.

---

*Pro se* plaintiff Jason James Hyatt claims that defendants violated his constitutional rights to access the courts and to equal protection during his incarceration at the Portage County Jail in 2016. In particular, Hyatt claims that: (1) defendants denied him timely access to all of his legal materials in order to prepare adequately for a hearing in his criminal case; and (2) defendants discriminated against him by denying access to the phone and canteen, as well as to other materials he was ordinarily allowed to have in his cell.

Now before the court are defendants' motion for summary judgment (dkt. #74), Hyatt's motion for a temporary restraining order (dkt. #112) and Hyatt's motion to compel and for a continuance (dkt. #120). As for Hyatt's motion for a temporary restraining order, it concerns matters and parties wholly outside the scope of the present lawsuit and, therefore, that motion must be denied. Since the evidence of record would not support a reasonable finding in plaintiff's favor on any of his claims, the court will grant defendants' motion, deny Hyatt's motion to compel as moot, and enter judgment in defendants' favor.

Plaintiff Jason James Hyatt is currently incarcerated at Waupun, but the events comprising his claims in this lawsuit took place when he was incarcerated at the Portage County Jail. The three defendants were each working at the jail during the relevant time period. They are Portage County Sheriff Mike Lukas, Captain Nelson and Sergeant Boettcher.

## I.      Jail Grievance Process and Hyatt's Use of that Process

The Portage County Jail has an Inmate Orientation Handbook that is provided to all inmates when they are booked into the jail. The handbook provided the process jail inmates were required to use to grieve conduct by jail staff. In particular, it directed inmates who were unable to resolve issues informally to submit a grievance within fourteen (14) days of the alleged conduct's occurrence. Then, if inmates were dissatisfied with the decision they received, inmates were required to appeal that result to the Jail Administrator

---

[1] Except as otherwise noted, the following facts are material and undisputed for purposes of the pending summary judgment motion based on the parties' proposed findings of fact, responses, and the underlying evidence submitted in support. The court also notes that while Hyatt purports to dispute many of defendants' proposed findings of fact, he typically does so without citation to the record in this case or at least indicating a reason to infer that the dispute is based on his own personal knowledge. To the extent Hyatt's dispute appears based on personal knowledge, the court will accept his statements in his signed response to defendants' motion for summary judgment (*see* dkt. #87), but will deem the other proposed facts undisputed without record evidence. Hyatt has also responded to many of defendants' proposed findings of fact with additional statements or apparent doubts about the veracity of the proposed fact, but his statements are often based on conjecture and never supported by evidence (even his own averments). As such, the court will deem those proposed findings of facts as undisputed as well.

within five days of the initial decision on the grievance. During the time Hyatt was at the jail, the jail's policy was to collect non-emergency requests and grievances at 10:00 p.m. and to respond to them the following day.

Hyatt was incarcerated at the Portage County Jail from April 26, 2016, through November 9, 2016. During that time, he filed 316 requests, grievances and appeals. Yet according to defendants, Hyatt only followed the jail's grievance process with respect to *eight* of his complaints. Moreover, defendants' assert that *none* of those grievances related to his class of one equal protection claim, nor do they mention that Hyatt was being treated differently than other similarly situated inmates with respect to the use of phones, canteen access or the amount of materials he was allowed to store in his cell. While Hyatt disputes this last fact, his only basis for doing so is that he does not understand what "similarly situated" means. More importantly, he does not direct the court to *any* grievance he filed that addressed these issues.

## II. Policies Related to Phones and Canteen, and Hyatt's Access to Phones and Canteen

### A. Jail Policies Related to Phone Use

During the relevant time period, two phones were available to inmates inside each cell block for fifteen hours a day. Inmates were allowed to call anyone they wanted, including friends and family members, as well as employers. The jail did not place limits on who inmates could call on those phones. However, inmates were not allowed access to

the phones when they were in solitary confinement or when the jail was in lockdown.

There were two other phones located outside the cell blocks that inmates could ask to use in very limited circumstances. One was the so-called "jail staff phone"; the other was referred to as the "social worker's phone." For example, inmates might be allowed to use the jail staff phone if they: (1) were being booked and needed to make their initial call, (2) were dealing with an emergency or (3) needed to contact their employer. If given permission, inmates could also use the social worker's phone. Inmates did not have to pay to use either of these two phones, although access was limited due to safety and security concerns, especially since conversations on these phones were not monitored or recorded by the jail. Finally, the jail did not have a written policy as to which staff should decide whether an individual inmate should be allowed access to the jail staff or social worker's phone.

B.    Hyatt's Use of the Phones

Hyatt and other inmates regularly requested to use the jail staff and social worker's phones, rather than a cell block phone, and Hyatt claims that jail staff refused to allow him to use either of these phones. While Hyatt has provided no details about when those denials actually took place, he specifically alleges that they were in response to his requests to call his family and friends about an upcoming hearing in his criminal case. In contrast, defendants maintain that when Hyatt was denied access to those phones, jail staff had a legitimate reason: Hyatt's need for the phone did not constitute an emergency. Defendants further assert that jail staff believed Hyatt wanted to use the non-cellblock

phones because he would not have to pay for the call. Hyatt responds that he only asked to use staff or social worker phones when he had an "objective legal emergency" and no other mode of communication was available, but also testified at his deposition that he did not want to use cell block phones for those purposes at "a dollar a minute." (Hyatt Dep. (dkt. #82-2) at 111.)

While Hyatt also suspects that Sheriff Lukas or Captain Nelson instructed jail staff to deny him access to the jail staff phone, he cites to no evidence, including any sworn statements about interactions with Lukas, Nelson *or* any other jail staff that would support his suspicion. To the contrary, Sheriff Lukas avers that, although he tries to visit the jail once or twice a week to meet with jail staff, he rarely meets with inmates or becomes aware of inmates' personal situations, since these responsibilities are typically delegated to jail staff. Moreover, Lukas specifically avers that he did not know Hyatt was being restricted with respect to phone use.

With respect to other inmates' access to the jail staff phone, Hyatt provided two examples. First, Hyatt claims that another inmate, Adam Hughes, was allowed to use the phone in the booking area, although he also concedes that Hughes was acting in a way suggesting that his call was urgent. Second, Hyatt claims that an unknown inmate was allowed to use the jail staff phone to call his employer on a probation-related issue. In both examples, Hyatt also admitted that he was unable to actually hear what those inmates were saying during those phone calls. (*Id.* at 106.)

### III.     Canteen Access

During the relevant time period, Hyatt's inmate account was frozen.  Captain Nelson was responsible for enforcing court orders and withholding money from inmate accounts to pay court filing fees.  Since Hyatt had outstanding court filing fees due in at least two cases, Nelson explains that jail staff were required to forward Hyatt's money to the court to pay those fees.  Nelson further explains that if there was not enough money left in Hyatt's account to pay for his canteen orders after these filing fees are withheld, then the jail canceled Hyatt's canteen orders.  Hyatt has not only failed to come forward with any examples of other inmates who owed filings fees, it is *undisputed* that no other inmate at the jail had a pending lawsuit during the relevant time period.

Hyatt's canteen orders included a request for envelopes, which he wanted to use for his legal matters.  Before being put on indigent status, Hyatt understood that he, like other non-indigent inmates, could order thirty envelopes from the canteen.  After he became indigent, Hyatt claims that he was unable to purchase envelopes from the canteen, apparently also due to his outstanding fees.  Still, Hyatt has not come forward with any evidence that shows he was treated differently from other indigent inmates with respect to the use of the jail's canteen, nor could he answer how he was treated differently during his deposition.

Hyatt does claim that the jail's policy or practice was to "pencil whip" the books, meaning that once indigent, his canteen orders automatically were cancelled, so that his other debts could be paid.  Defendants deny having such a policy or practice.  Rather, according to Captain Nelson, the jail had to withhold money from Hyatt's account to pay

outstanding court fees. Accordingly, Hyatt's canteen orders were only cancelled if after those withdrawals, he lacked funds to pay for the items he ordered.

## IV.    Hyatt's Materials in his Cell

During Hyatt's time at the jail, the inmate handbook included a contraband policy. The purpose of this policy is to protect and promote the internal safety and security of the jail, including both inmates and staff. Among other things, this involves keeping the jail clean and eliminating potential fire hazards. In particular, the policy allowed inmates to keep up to a 3-inch stack of legal paperwork, up to three soft cover books, and up to three magazines.

When Hyatt arrived at the jail in April 2016, Captain Nelson determined that Hyatt's banker's box of legal materials presented a fire hazard and posed safety and security risks for the jail. Accordingly, Nelson and Sergeant Boettcher decided not to allow him to keep the entire box of legal materials in his cell. Instead, on April 26, 2016, Hyatt was told to take whatever he actually needed in his box of legal materials, and that the remainder would be stored elsewhere. Hyatt does not dispute what he was told, but claims he was not allowed to take what he actually "needed." Even so, Hyatt does not dispute that he was permitted to keep about a one-foot high stack of materials in his cell.

Since he was allowed to possess all of his legal materials in his cell at the jail at certain times, Hyatt further disputes that his legal materials posed any kind of real hazard.[2]

---

[2] Hyatt offers two such examples: one was in February of 2014, and a second instance was after a September 9, 2016, hearing.

7

However, Hyatt offers no examples of other inmates being allowed to store more legal materials in their cells, and he has not come forward with any evidence rebutting defendants' position that the jail applies a single policy when it comes to the amount of materials inmates may keep in their cells.

V.    **Access to Courts**

Finally, Hyatt's access to courts claim arises from his efforts to withdraw a no-contest plea in Portage County. On October 6, 2015, Hyatt entered a no-contest plea in Portage County Case No. 14-CF-57, on three charges:  second-degree recklessly endangering safety, false imprisonment and bail jumping.  Days later, Hyatt decided to withdraw his guilty plea, on the ground that he was mentally impaired due to being held in solitary confinement at Green Bay Correctional Institution ("GBCI") at the time he entered into the plea.  Hyatt claims to have communicated as much to his attorney, Jeffrey Jazgar.  On January 28, 2016, during the scheduled sentencing hearing, Jazgar withdrew as Hyatt's counsel.  The court then appointed Attorney Thomas Zoesch to represent Hyatt and set a new sentencing hearing for April 8, 2016.  After an issue arose with Zoesch's representation, the court appointed yet another attorney, Brian Severson, to represent Hyatt, and set a status conference for May 16, 2016.

During this time period, Hyatt maintains that none of his attorneys asked for legal materials to prepare for a plea withdrawal hearing.  While Hyatt claims that he wrote to his attorneys setting forth his expectations, he also acknowledges not sending any of his subsequent attorneys copies of documents that might relate to withdrawing his plea.

8

(Hyatt Dep. (dkt. #82-3) at 240-41, 247-48.)  Hyatt recalled having telephone conferences with his last appointed counsel, Severson, related to his health records, but could not specifically recall whether Severson actually asked for those records; nor could Hyatt recall whether he and Severson discussed Hyatt's need to communicate with his family, friends, or previous attorneys.

On April 26 or 27, 2016, Hyatt was allowed to review all of his legal materials for approximately twenty minutes to determine which items he wanted to keep in his cell for purposes of bringing a motion to withdraw his plea in Case No. 14-CF-57, since that was his most pressing legal matter.  During the following six-month period of time, Hyatt unfortunately was being held in solitary confinement, where he was only able to access certain legal materials upon request.  Hyatt claims that while he made requests, those requests were denied.

On the morning of September 9, 2015, the day of Hyatt's plea withdrawal hearing, Sergeant Boettcher provided Hyatt access to all of his legal materials.  However, Hyatt claims that he was only allowed another brief window of time to review his materials, and when Hyatt went through his materials, he failed to gather any of his GBCI grievances that would reveal his deteriorated mental state.  While claiming that his review of those materials was extremely rushed, Hyatt has not submitted evidence suggesting that his counsel Severson wanted those materials; to the contrary, he testified in his deposition that Severson did not believe the grievances were important.  (Hyatt Dep. (dkt. #82-3) at 254.)

Hyatt appeared with Severson in court for his plea withdrawal hearing on September 9, and testified on direct examination that he believed Jazgar had been

unprepared to proceed when the court accepted his no-contest plea. Hyatt further testified that he acquiesced with the no-contest plea on those charges because he was being held in solitary confinement at GBCI at that time, which altered his mental state.

While Hyatt acknowledges not remembering exactly what he said during his motion to withdraw hearing, he believes he conveyed not having enough time to prepare, although the transcript of that hearing does not include such testimony from Hyatt. (Plea Withdrawal Hrg. Tr. (dkt. #82-1) at 4-35.) The transcript also shows that: Severson did not object to having insufficient time or information to prepare for the hearing; the judge reviewed Hyatt's testimony at his original plea hearing that he had not been threatened and was entering into the plea voluntarily; and the judge confirmed that Hyatt had the opportunity to tell the judge if he had concerns about his conditions at GBCI. (*Id.*)

At the conclusion of the hearing, the judge denied Hyatt's motion to withdraw his no-contest plea, observing that: based on previous experience, Hyatt was comfortable speaking openly and honestly in court; Hyatt's demeanor during the October 6 plea hearing suggested he was in "pretty good shape," "like he was in full control of his faculties," and "he wasn't struggling in any way"; and Hyatt was relaxed, joking around, and seemed relieved that the process was over. (*Id.* at 64-66.) As a result, the judge found Hyatt's description of his mental state at the time the court accepted his plea to be incredible and denied the motion.


OPINION

Summary judgment is appropriate where the moving party establishes "that there is

no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A nonmoving party with the burden of proof cannot "simply show that there is some metaphysical doubt as to the material facts," since a mere "scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, "there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 252). While defendants not only seek judgment on the merits, but also on qualified immunity grounds and, in part, on exhaustion grounds, the court will focus on the parties' merits-based arguments, since it is apparent that plaintiff has failed to come forward with sufficient evidence for a reasonable trier of fact to find in his favor on any of his claims.

## I.     Motion for Temporary Restraining Order

As an initial matter, Hyatt's request for a temporary restraining order must be denied because he is requesting new relief against various, non-party staff at Waupun Correctional Institution ("Waupun"), while his legal claims in this case relate to events and defendants at the Portage County Jail in 2016. If Hyatt believes he has a claim against Waupun employees, he must first exhaust the administrative remedies offered by that institution, and only then, if not resolved to his satisfaction, he may pursue a separate lawsuit.

Even then, the court would encourage Hyatt to consider whether he really wants to pursue another lawsuit on the basis of denied access. In his 13-page motion, Hyatt claims that various Waupun employees have been thwarting his ability to access the courts by refusing legal loans, requiring him to make co-payments for his medical needs, and forcing him to take a low-paying job that requires him to work 40 hours a week for pay that will likely be taken from him to pay other debts. These complaints have been a consistent refrain throughout Hyatt's current lawsuit, but they are unsubstantiated and at this point ring hollow. Indeed, Magistrate Judge Crocker has looked into Hyatt's claims that defense counsel or prison staff have been preventing him from litigating this claim, and concluded in the negative. (*See* dkt. ##86, 110.) Hyatt's filings show an understanding of the relevant legal principles, but it appears that he believes seemingly typical constraints that come with incarceration amount to inadequate access to the court.

Even setting aside the merits of certain of his complaints, Hyatt seems unable to appreciate the obvious contradiction in his making those complaints while being given access to dozens of pages of paper and postage to file his grievances with this court. What is more unfortunate is that Hyatt appears intent on spending his time preparing complaints about the limitations on his ability to litigate his claims, rather than preparing substantive arguments and gathering evidence to support his claims. Regardless, it is not a reason to conclude that he is entitled to any sort of injunctive relief in this case.

## II.    Access to Court

Prisoners have an unquestionable constitutional right to access courts for purposes of pursuing post-conviction remedies and for challenging the conditions of their confinement.  *See Campbell v. Miller*, 787 F.2d 217, 225 (7th Cir. 1986) (*citing Bounds v. Smith*, 430 U.S. 817, (1977)); *Wolff v. McDonnell*, 418 U.S. 539, 578-80 (1974); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).  Indeed, to insure meaningful access, states have an *affirmative* obligation to provide involuntarily institutionalized persons with "adequate law libraries or adequate assistance from persons trained in the law."  *Bounds*, 430 U.S. at 828.

To state a claim of denial of access to courts, however, the plaintiff must allege facts from which an inference can be drawn of "actual injury."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996).  At a minimum, the plaintiff must allege facts showing that the "blockage prevented him from litigating a nonfrivolous case."  *Walters v. Edgar*, 163 F.3d 430, 433-34 (7th Cir. 1998).  To state access to courts claim, therefore, plaintiff must allege that he was deprived of the ability to pursue "a legitimate challenge to a conviction, sentence, or prison conditions."  *Pratt v. Tarr*, 464 F.3d 730, 731–32 (7th Cir. 2006).

Hyatt claims that Captain Nelson and Sergeant Boettcher thwarted his ability to prepare for a plea withdrawal hearing by limiting his access to his legal materials.  However, the evidence of record does not support a reasonable inference that the legal materials he did not have in his cell between April and September of 2016 actually prevented him from

withdrawing his no-contest plea.[3]  More specifically, Hyatt claims he could not adequately present his basis for withdrawing his plea:  that his state of mind during the original October 6, 2015, plea hearing was negatively altered by the conditions at GBCI, which affected his ability to voluntarily enter in the plea.  However, the evidence does not support this claim.

To start, while Hyatt may not have had *all* of his legal materials in his cell between April of 2016 and his September 9, 2016, hearing on his motion to withdraw his plea, Hyatt has presented *no* evidence that any of those legal materials would have affected the outcome of that hearing.  To the contrary, Hyatt acknowledges that he was able to speak with his attorney over the phone before the hearing, and further admitted in his deposition that attorney Severson did *not* believe the grievances Hyatt filed at GBCI would even have been helpful at the hearing.  In any event, on the morning of the plea withdrawal hearing, September 9, 2016, Hyatt *was* allowed to review all of his legal materials, albeit briefly. While Hyatt claims his materials were disorganized and he simply did not have enough time to find what he needed, the record of the hearing establishes that neither Hyatt nor Severson objected to proceeding based on Hyatt's claimed inability to access of his documents sooner or adequately.

Regardless, Hyatt *was* able to testify about his mental state as of October 6, 2015. His argument was simply unsuccessful.  Indeed, the transcript of the hearing shows the

---

[3] It also appears that Hyatt's access to courts claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), since success on this claim would necessarily imply that his criminal conviction is invalid. However, defendants did not raise this defense, so the court will not find in their favor on that basis.  *See Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999) (failure to plead the *Heck* defense constitutes waiver).

judge found incredible Hyatt's testimony about his state of mind as of October 6, 2015, based on the judge's own recollection of Hyatt's demeanor during the original plea hearing. The judge elaborated *at length* on this point: reiterating all of the questions Hyatt had been asked during the plea hearing about his state of mind, as well as his responses, all confirming that he entered into his plea knowingly and voluntarily. Furthermore, the judge specifically recalled Hyatt's demeanor during the plea hearing, noting in particular that he actually seemed more relaxed and relieved after entering his plea, which the judge attributed to relief despite understanding the ramifications of the parties' plea agreement. Based on this evidence of record, no reasonable fact finder could conclude that if Hyatt had access to more of his legal materials before his plea withdrawal hearing, that motion would have been successful.

## III. Discriminatory Treatment

A plaintiff may bring a "class of one equal protection" claim for being treated "intentionally . . . differently from others similarly situated" for no rational reason. *See D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Whether this type of claim is even cognizable in the prison context is unclear, and defendants encourage the court to conclude that it is not. In particular, defendants point out that this court has recognized "class-of-one claims are likely never cognizable in the prison disciplinary context" because they involve discretionary decision-making by prison officials, to which courts typically defer. *Taliaferro v. Hepp*, No. 12-cv-921, 2013 WL 936609, at *6 (W.D. Wis. Mar. 11, 2013).

That conclusion was a logical extension of the United States Supreme Court's conclusion in *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008), that government employees cannot bring class-of-one claims challenging adverse employment because such actions are discretionary, "based on a vast array of subjective, individualized assessments." *Id.* at 605. And it would appear the Court of Appeals for the Seventh Circuit would agree as well, having affirmed the denial of a prisoner's challenge to disciplinary decision-making because of its discretionary nature. *Howard v. Koeller*, 756 F. App'x 601, 604 (7th Cir. 2018) (citing *Engquist*, 553 U.S. at 603; *Abcarian v. McDonald*, 617 F.3d 931, 939 (7th Cir. 2010)). While defendants have a fair point, the court need not reach this question, since Hyatt's claim does not pertain to *disciplinary* decisions and, in any event, so plainly fails on the merits.[4]

Here, Hyatt claims unequal treatment related to his phone and canteen access, as well as materials he was allowed in his cell. To succeed on this claim, however, Hyatt must prove that defendants: (1) intentionally treated him differently, and (2) had no rational basis for singling him out for negative treatment. *See Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016); *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 914 (7th Cir. 2012). While not imperative to prove his claim, to show disparate treatment a plaintiff may provide evidence of more favorable treatment of other, similarly situated inmates. *See Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) ("In most class-of-one cases,

---

[4] Defendants also seek judgment on plaintiff's "class-of-one" equal protection claims for failure to exhaust his administrative remedies with respect to these claims, but the court need not address this procedural defense either.

the comparison of similarly situated individuals will be used to show animus.").

As defendants point out, to the extent the court construes Hyatt's class of one claims to be against defendants in their official capacities, such claims must fail, not only on the merits but also because Hyatt has not challenged the constitutionality of any policy, practice, or custom of Portage County or the Portage County Sheriffs' Office, nor has he developed a record suggesting that jail policies authorized staff to treat inmates differently. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The closest Hyatt comes is his claim that the jail had the practice of "pencil whipping" the books. On summary judgment, however, Hyatt has not come forward with any evidence that this was an actual practice within the jail. In any event, as explained below, the cancellations of Hyatt's canteen orders did not violate his constitutional rights.

As for Hyatt's claims against defendants in their individual capacities, defendants have put forth unrebutted evidence of the legitimate justifications for denying use of the staff phone as desired, certain rejections of his canteen orders, and the restrictions on the amount of materials he could have in his cell.

A.      **Jail Staff Phone Use**

As to phone use specifically, Hyatt claims that Sheriff Lukas and Captain Nelson told jail staff to deny him access to the jail phone. Consequently, unlike other inmates, he could not call his family even when he was facing a legal emergency. Even accepting that Hyatt was not allowed to call his family just before one of his criminal hearings, no reasonable jury could find that any of the defendants was personally involved in denying

him access to the jail staff phone during a specific emergency, nor that they instructed other jail staff to deny Hyatt access to that phone during an emergency. As a result, there is no evidence of differential treatment.

To start, the evidence of record shows that Hyatt's access to the cell block phones was not any different from other inmates, and Hyatt does not claim that he was ever wrongfully denied access to those phones. Instead, his complaint is that he wanted to be able to use the jail staff phones to call his family about his legal matters. In contrast, the jail had a policy that limited inmate access to the staff phone to emergency circumstances or when inmates needed to contact their employers. That policy appears grounded in the legitimate interest of maintaining jail safety and security: since the jail staff phone is not monitored, the jail has a legitimate interest in limiting the types of calls inmates may conduct on those phones. Regardless, there is no evidence suggesting that the denials of Hyatt's request went against jail policy, and the evidence of record indicates that this policy was applied to Hyatt no differently than to other inmates.

More specifically, Hyatt describes an incident in which he was denied access to the jail staff phone while trying to call his family about an upcoming hearing in his criminal proceeding. Hyatt *suspects* that Sheriff Lukas or Captain Nelson might have told jail staff to deny him access to the jail staff phone, but submits *no* evidence to support his suspicion, such as an affidavit from another inmate, a family member, a jail staff member, or even his own averments. His suspicion, alone, is insufficient to create a factual dispute as to whether Lukas and/or Nelson instructed staff to deny his requests to use the jail staff phone.

Moreover, Hyatt's representation that he was dealing with a legal emergency in wanting to call his family is too vague to support a reasonable finding that he was being treated differently than other inmates seeking to use the jail staff phone. For one, Hyatt submits no evidence suggesting that he actually explained to *any* jail staff that he had a legal emergency; instead, he claimed not to have any other way to call his family. Even then, Hyatt did not actually aver to having no money to use the regular cell block phones. Nor has he explained why, if he were experiencing an actual legal emergency, he would not have been attempting to call or meet with his attorney. Moreover, there is no evidence of record suggesting that attorney Severson was unable to prepare Hyatt for his motion to withdraw hearing because Hyatt was somehow prevented from calling his family. It follows that no reasonable jury could conclude that any jail staff -- much less any of the named defendants -- acted arbitrarily, or in an effort to punish him, in denying his request to use the jail staff phone.

To be fair, Hyatt does point to two instances in which other inmates *were* allowed to use the jail staff phone, but neither are comparators that would allow a reasonable fact-finder to conclude Hyatt had been treated differently without a legitimate reason. First, Hyatt identifies one inmate, Adam Hughes who was allowed to use the phone in the booking area. However, Hyatt agreed that that individual had some urgency, or at least importance, that merited use of the staff phone, and that inmates at the jail were allowed to use the jail staff phone in emergency circumstances. Again, Hyatt has not come forward with evidence that would permit a reasonable jury to agree that he was facing an emergency nor singled out for different treatment. Accordingly, the example of Hughes being able to

use the jail staff phone in an urgent situation is not evidence that Hyatt was treated worse than that inmate in an effort to punish him. Second, Hyatt claims, even more vaguely, that an unknown inmate was allowed to use the jail staff phone to call his employer on a probation-related issue. Yet, again, jail policy allowed inmates to use the jail staff phone to call employers. Moreover, given that Hyatt does not claim that jail staff ever denied his request to call an employer, this other inmate is not a proper comparator.

This lack of evidence, especially in combination with Lukas' and Nelson's averments that they either had *no* involvement in denying Hyatt access to the jail staff phone when he had an actual emergency, dooms his class of one claim. Indeed, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal citation and quotation marks omitted). Hyatt has simply not done that here.

### B.    Canteen

Hyatt also claims that Captain Nelson arbitrarily denied his canteen orders, but he has come forward with no evidence supporting such a finding. On the flip side, defendants have again provided undisputed evidence that because he had outstanding court filing fees due, Hyatt's canteen orders had to be cancelled for insufficient funds. While Hyatt might disagree with the jail's policy of paying court-ordered filing fees, he has again offered no evidence to suggest that there was actually a different, illegitimate reason for defendant

Nelson to cancel his order.  Accordingly, Hyatt's class of one claim with respect to his access to the canteen fails as a matter of law as well.


### C.    Materials In Cell

Finally, Hyatt claims that Captain Nelson and Sergeant Boettcher arbitrarily refused to allow him to keep all of his legal materials in his cell.  Hyatt does not dispute that the jail's contraband policy, grounded in the jail's interest in safety and security, prohibits all inmates from possessing a stack of legal materials exceeding three inches, more than three soft cover books, and more than three magazines.  In accordance with that policy, Nelson and Boettcher agreed that Hyatt's voluminous legal materials constituted a fire hazard.  Furthermore, undisputed evidence shows that Hyatt was allowed to keep *one foot* of legal materials in his cell, which demonstrates that Hyatt was actually allowed to keep *more* legal materials than permitted by jail policy generally, suggesting that staff were treating him leniently in this respect, not in an effort to punish him or treat him worse than other prisoners.

While Hyatt claims that his legal materials did not constitute a fire hazard, he has not actually provided evidence of the amount of legal materials he wanted to keep in his cell, and the evidence defendants provided indicates that he was allowed to keep well in excess of jail policy.  More importantly, even assuming that Hyatt had a point regarding the actual fire hazard that his box of legal materials represented, he has not come forward with any evidence even hinting that defendants Nelson and Boettcher, or any other jail staff for that matter, applied the policy in an effort to single him out for punishment.

Similarly, Hyatt offered no evidence that other inmates were allowed to keep more documents in their cells; instead, he claims there were two periods of time that he was allowed to possess more of his materials in his cell: once in February of 2014 and again in September of 2016, when Hyatt returned to his jail cell after the hearing. Accepting that to be true, no reasonable jury could agree that Nelson's and Boettcher's April 2016 decision to limit the amount of legal materials Hyatt had in his cell was intended to punish him, rather than to follow the jail's contraband policy. Accordingly, defendants are entitled to judgment on the merits of this claim as well.

## ORDER

IT IS ORDERED that:

(1)     Plaintiff Jason Hyatt's motion for temporary restraining order and preliminary injunction (dkt. #112) is DENIED.

(2)     Defendants' motion for summary judgment (dkt. #74) is GRANTED.

(3)     Hyatt's motion to compel and request for a continuance (dkt. #120) is DENIED as moot.

(4)     The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 17th day of September, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge